UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JAMES DONALD VANCE, JR.,
   a/k/a "Diaperjdv,"

    Defendant.
_____/

No. 1:25-CR-00088-PLM

Hon. Paul L. Maloney
United States District Judge

## GOVERNMENT'S SENTENCING MEMORANDUM

Between February and April 2025, Defendant James Donald Vance, Jr. posted several threatening communications online and made specific, direct threats to kill four people, including the President and Vice President of the United States. He was charged with, and pled guilty to, threatening to kill and injure the President and Vice President of the United States and making an interstate threatening communication, in violation of 18 U.S.C. §§ 871 and 875(c), respectively. Both offenses are punishable by up to five years in prison and a $250,000 fine.

The presentence investigation report scored the United States Sentencing Guidelines at offense level 19 and criminal history category I, resulting in an advisory range of 30 to 37 months in prison. (R.25: PSR, PageID.96.) The government concurs with the scoring and Defendant objected to not receiving the "zero-point offender" reduction under USSG § 4C1.1.

## I.     The Zero-Point Offender Adjustment Does Not Apply.

Although Defendant has no criminal history points, the Probation Office did not apply the two-level reduction for "certain zero-point offenders" because Defendant's online posts constitute "credible threats of violence," which disqualifies him from the reduction. USSG § 4C1.1(a)(3). Additionally, Defendant possessed a firearm in connection with the offense, another disqualifying factor. *See* USSG § 4C1.1(a)(7). Defendant's objection should be overruled.

The zero-point offender reduction became effective on November 1, 2023, pursuant to Amendment 821. *See* USSG Supp. to App. C, amend. 821 (Nov. 1, 2023). To receive a two-level decrease in the offense level under § 4C1.1, the defendant must meet all 11 criteria in that Guideline. *United States v. Ashrafkhan*, 129 F.4th 980, 983 (6th Cir. 2025) (describing the Guideline as an "eligibility checklist"). The burden is on Defendant to demonstrate eligibility for the reduction. *Id.* at 984. In addition to the other criteria not at issue in this case, the Defendant must demonstrate that he: "did not use violence or credible acts of violence in connection with the offense" and "did not possess … a firearm or other dangerous weapon ... in connection with the offense." USSG § 4C1.1(a)(3) & (7).

The Guideline does not define "credible threats of violence." The terms "offense" and "firearm" have the same meaning given to those terms in the Commentary to USSG § 1B1.1. *See* USSG § 4C1.1(b). Accordingly, the term "offense" means "the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the

2

context." USSG § 1B1.1, comment. (n.1(I)).

The government could not find Sixth Circuit authority interpreting the phrase "credible threats of violence" used in USSG § 4C1.1(a)(3). However, the Sixth Circuit has interpreted a similar phrase in a drug guideline that provides for a two-level increase in the Offense Level if the defendant "used violence, *made a credible threat to use violence*, or directed the use of violence." USSG § 2D1.1(b)(2) (emphasis added).

In that context, the appellate court stated that, "[w]e have described 'a credible threat to use violence' as analogous to a 'true threat' for First Amendment purposes." *See United States v. Mabery*, No. 23-5733, 2024 WL 4565573, at *5-6 (6th Cir. Oct. 24, 2024) (citing *United States v. Roberson*, 2024 WL 2154285, at *4 (6th Cir. May 14, 2024)). *Mabery* further described the test as, "[a] defendant must have expressed a communicated intent to inflict harm (the ordinary meaning of threat)" and "the expressed intent to injure must have been capable of being believed by the listener (the ordinary meaning of credible)." *Id.* (cleaned up).

In *Mabery*, the court of appeals affirmed application of the § 2D1.1 enhancement, which was based on witness testimony that defendant "wanted her to 'get in contact with' Taylor to 'lure her out' so that Mabery and Lyons could have her 'beat up.' *Id.* at *5. On appeal, the defendant argued that the threat was not believable because he was just conveying "blustery toughness." The court of appeals affirmed the district court's finding that the defendant's statements "suggested that he truly sought to harm her and was not blowing off steam." *Id.* (cleaned up).

In *Roberson*, another Sixth Circuit decision interpreting § 2D1.1(b)(2), the

3

court stated:

> [T]he communication must qualify as what the Supreme Court has called a "true threat" in the First Amendment context. *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). The guideline thus excludes "hyperbole," sarcasm, or similar statements that, when read in context, could not be reasonably read as communicating a realistic "possibility that violence will follow[.]"

2024 WL 2154285, at *4-5 (quoting *Counterman*). *Roberson* affirmed application of the enhancement where the defendant posted a series of messages on social media making threats against the police officers who searched his home. The district court found that a reasonable person would interpret the collection of social media posts as threats to harm the two officers. In that case, the posts required some interpretation (e.g., the use of emoji showing "fire and muzzle blast" and a comment that the officer "ain't worth it, but I want him gone"). The court of appeals agreed: "Those statements objectively conveyed a 'communicated intent' to harm the officers rather than … mere 'bluster.'" *Id.* at *5. The court also pointed to evidence that the defendant posted messages indicating that he had access to guns and money, which "suggested that he had the means to carry out this desire." *Id.*

In this case, Defendant's threats were specific, direct, and credible. Defendant plainly expressed an intent to kill the President, Vice President, and others in the Internet post charged in Count 1 of the Indictment:

4



The credibility of the threat was bolstered by Defendant's statement that he did not have a long time to live and did not care about the probable consequences. And there are facts supporting the veracity of that assertion: Defendant is 67 years old and suffers from a variety of serious medical ailments. (R.25: PSR, ¶74, PageID.86-87.)

The second charged online threat, a response to another user's post about a story from a website about politics and the media, also was clear, direct, and credible:



Nothing about those two threats could fairly be interpreted as intending to convey a joke, sarcasm, or hyperbole. Additionally, other contemporaneous posts on Defendant's social media account, which constitute relevant conduct, lend further credibility to the charged threats because they demonstrate that Defendant communicated consistent, deeply held beliefs and a desire to kill the victims of his threats. For example, Defendant also posted the statement: "I call for trump to be shot," and posted two messages talking about the benefits of detonating a "dirty bomb" near the U.S. Capitol and White House. (R.25: PSR, ¶15, PageID.77-78.)

Finally, Defendant also communicated that he had a firearm he would use to carry out his threats. On February 17, 2025, using the same social media account, Defendant posted the following picture and message:



(R.25: PSR, ¶15, PageID.77-78.) That message made his threats to kill more credible because it "suggested that he had the means to carry out" those threats. *Roberson*, 2024 WL 2154285, at *5. Additionally, the post, and the fact that Defendant was found in possession of a 9mm pistol, a fully loaded 10 round 9mm pistol magazine, and a box of 9mm ammunition when he was interviewed by the U.S. Secret Service, disqualifies Defendant from the zero-point offender reduction because he possessed a firearm in connection with the offense. *See* USSG § 4C1.1(a)(7); (R.25: PSR ¶¶16, 19, PageID.78-79.) That disqualifying factor "says nothing about whether the firearm was legally obtained for noncriminal purposes, requiring only that it was possessed 'in connection with the offense.'" *United States v. Vargas*, No. 24-50362, 2025WL 416997, *1 (5th Cir. Feb. 6, 2025).

The cases cited by Defendant in his objection to the PSR are inapposite. In *United States v. Yang*, Nos. 23-100 & 23-284, 2024 WL 519962, *4 (D.D.C. Feb. 9, 2024), the district court concluded that the defendants did not engage in violence or credible threats of violence within the meaning of USSG § 4C1.1. However, one defendant was not alleged to have communicated anything, and the other defendant's social media video communication did not expressly state an intent to kill another person. The district court found that the video statements described past events that amounted to political rhetoric, not threats to kill or injure others. *Id.* at *5-6. Here, Defendant's statements are threats of future assassinations that he said he would commit, which were conveyed in a manner that made them credible.

In *United States v. Johnson*, 64 F.4th 1348, 1352 (D.C. Cir. 2023), the D.C.

7

Court of Appeals affirmed a two-level increase under § 2D1.1(b)(2) because the defendant made three credible threats to use violence. The threats included: "Imma strap up, man, and slide up on shorty man;" "Shawty gonna make me punch him in the mouth with that gun;" and "I'm a kill his ass! On my life! Kill his ass!" *Id.* The defendant was armed and had previously shot someone. There, the defendant argued that his statements did not qualify as threats because he never intended to use violence. The D.C. Circuit rejected the argument, stating: "a threat is a threat, even if the speaker never intends to carry it out." *Id.*, at 1352 (citing *Elonis v. United States*, 575 U.S. 723 (2015)). Thus, *Johnson* supports the government's argument that Defendant's threats to kill the President, Vice President, and the President's son were credible, even though Defendant has no criminal history and now says he would not have carried out his threats to kill.

In *United States v. Pineda-Duarte*, 933 F.3d 519, 522-23 (6th Cir. 2019), another § 2D1.1(b)(2) case, the Sixth Circuit stated that the Sentencing Commission sought to enhance the sentence of defendants who, "with the intent to injure another, credibly communicates that intent, without acting on it …." In that case, the defendant did <u>not</u> "vocalize[] or otherwise express[] his intent to injure," but rather swung a shovel "either reflexively or with the intent to injure the officer." *Id.* The parties only agreed that the defendant "moved the shovel he was holding toward an officer when police announced their presence." *Id.* at 525. The appellate court remanded the case for additional factfinding. Accordingly, that case offers no help to Defendant.

Finally, Defendant cited the Supreme Court decision in *Watts v. United States*, 394 U.S. 705 (1969). That case does not help determine whether Defendant used credible threats of violence in connection with the offense. *Watts* reversed a jury verdict finding the defendant guilty of threatening to kill or injure the President where he made anti-draft statements during a public rally on the Washington Monument grounds. Given the context of the statements and reaction of the listeners, the Supreme Court found that the defendant had engaged in protected First Amendment political rhetoric.

Here, in stark contrast, Defendant's threats to kill are not protected by the First Amendment. Defendant pled guilty to three threat crimes, admitting that he communicated threats to assassinate the President and Vice President, and to murder two other people. Defendant admitted facts sufficient to establish that the charged social media posts were "true threats" as defined by the Supreme Court in *Elonis v. United States*, 575 U.S. 723 (2015), and *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). This Court accepted his guilty plea and convicted him of those crimes on August 13, 2025. (R.21: Order, PageID.40.) Defendant cannot both be guilty of those offenses and deny that his threats were not credible without calling into question the sincerity of his acceptance of responsibility.

## II.     Government's Sentencing Recommendation.

Threats to kill and injure government officials is a growing problem in this country. Earlier this year, the United States Capitol Police reported that the number of threat investigations involving Members of Congress has increased for the second

9

year in a row. In 2024, Capitol Police investigated 9,474 concerning statements and direct threats against Members of Congress and their staff and families, up from 8,008 in 2023, and substantially higher than the 3,939 matters investigated in 2017.[1]

This problem is not confined to threats against federal officials. Threatening violence against elected officials and other government employees poses a harm to democracy at every level of government. Local government officials reportedly have been the target of about 350 documented threats in the first eight months of 2025.[2] The rising number of threats, and actual violence perpetrated against both public officials and private citizens, requires substantial taxpayer-funded law enforcement resources to investigate and prosecute those matters. Moreover, communicating a true threat to kill or injure a public official, their staff, or family, by itself, is harmful to American democratic institutions. "Threats do not need to be executed beyond communication for them to be effective agents for instilling fear among victims and, most notably, disrupting democratic processes," including by "discouraging individuals from running for public office."[3]

---

[1] United States Capitol Police Press Release (Feb. 3, 2025), available at USCP Threat Assessment Cases for 2024 | United States Capitol Police.

[2] Bridging Divides Initiative at Princeton University, *Threats and Harassment Dataset: August 2025 Update* (Sept. 19, 2025), available at Threats and Harassment Dataset: August 2025 Update | Bridging Divides Initiative

[3] Simi, Ligon, Hughes, and Standridge: *Rising Threats to Public Officials: A Review of 10 Years of Federal Data,* Combating Terrorism Center at West Point, CTC Sentinel, Vol. 17, No. 5 (May 2024), available at CTC-SENTINEL-052024-article-3.pdf.

This Court's sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide Defendant with needed treatment. *See* 18 U.S.C. § 3553(a)(2). The sentence must also take into consideration the nature and circumstances of this offense and the history and characteristics of the Defendant. *See* 18 U.S.C. § 3553(a)(1).

In this case, Defendant has a history of communicating threats of violence. In 2018, Defendant was investigated by law enforcement for posting threats against the President on Facebook. At that time, he clamed not to recall the threatening message but admitted being investigated previously for making a threat directed at one of the President's children. Defendant denied any intent to act on those threats. (R.25: PSR, ¶14, PageID.77.) Defendant also has a history of sending abusive messages to people that anger him, once by voicemail in 2001 and once by email in 2015. In 2016, Defendant threatened to shoot his landlord with a 9mm handgun and "rip off one of his legs and beat him to death with it." When questioned by police, Defendant denied saying he would beat the victim to death with his leg. (Id., ¶53, PageID.82-83.)

Defendant was not deterred by those law enforcement interventions. Between February 2025 and April 2025, Defendant posted a series of threatening messages on social media, including that he would "murder" one of the President's children before he received U.S. Secret Service protection; promoting the detonation of a "nuclear 'dirty bomb'" in Washington D.C. near the Capitol and the White House; and calling for the President "to be shot." His messages culminated in a post on April 1, 2025, in which he directly threatened to kill the President, Vice President, and a special

government employee if they ever come to his city. When law enforcement arrived at Defendant's apartment to investigate those threats, he was in possession of a 9mm pistol and ammunition and admitted posting the threatening messages using the alias "Diaperjdv." (Id., ¶8, PageID.76.)

Communicating a threat to kill the President and Vice President of the United States is a very serious offense that consumes substantial public resources, including the work of the U.S. Secret Service National Threat Assessment Center in Washington, local Secret Service agents, and other assisting law enforcement agencies. Law enforcement must treat all such threats very seriously. Accordingly, general deterrence is an important factor in this case. The Court's sentence must promote respect for the law because threatening to kill or physically injure elected government officials and others cannot be countenanced.

The sentence in this case also must be sufficient to provide adequate specific deterrence to prevent Defendant from continuing to threaten public officials and their relatives. Several prior law enforcement contacts did not deter him from communicating additional threats of violence and murder. Defendant also must be punished for his criminal conduct, which was not a one-time momentary lapse of judgment. He has a history of communication threats of violence against others.

For all those reasons, in the government's view, a Guideline sentence of at least 30 months of imprisonment is sufficient but not greater than necessary to achieve the purposes of sentencing in this case.

                                        Respectfully submitted,

                                        TIMOTHY VERHEY
                                        United States Attorney

Dated: November 3, 2025          /s/ *Christopher M. O'Connor*
                                        CHRISTOPHER M. O'CONNOR
                                        Assistant United States Attorney

                                        United States Attorney's Office
                                        P.O. Box 208
                                        Grand Rapids, Michigan 49501-0208
                                        (616) 456-2404
                                        christopher.oconnor@usdoj.gov