UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

UNITED STATES OF AMERICA,

      Plaintiff,

v.

JAMES DONALD VANCE, JR.,

      Defendant.

                           /

Case No. 1:25-cr-88

Hon. Paul L. Maloney
United States District Judge

## DEFENDANT'S SENTENCING MEMORANDUM
## AND BRIEF IN SUPPORT OF MOTION FOR DOWNWARD VARIANCE

### Introduction

    James Donald Vance, Jr., through his attorney, Helen C. Nieuwenhuis of the Office of the Federal Public Defender, respectfully submits this memorandum in support of a sentence below the advisory guideline range pursuant to 18 U.S.C. § 3553(a). The statutory factors under § 3553(a) strongly support a treatment-oriented, non-custodial sentence. Mr. Vance is a 67-year-old first-time offender with significant physical and mental health issues. Although he has made threatening statements in the past, he has never acted on them. He fully cooperated with law enforcement, accepted responsibility, and immediately sought counseling and treatment. Given these factors, therapeutic intervention—not incarceration—will best protect the public by addressing the causes of his conduct and reducing any risk of re-offense. Moreover, the guideline calculation substantially overstates the seriousness of the offense, further supporting a downward variance. Finally,

Mr. Vance raises a legal objection that the two-level reduction for zero-point offenders under U.S.S.G. § 4C1.1 properly applies in this case.

**I. Variance Based on the § 3553(a) Factors**

   *A. Nature and Circumstances of the Offense — § 3553(a)(1)*

While conducting a routine search of the internet for potential threats, federal agents discovered several posts on the social media platform *Bluesky* threatening President Donald J. Trump, Vice President J.D. Vance, Elon Musk, and the President's son, Donald J. Trump, Jr. The posts were traced to Mr. Vance.

When the agents came to his residence, Mr. Vance fully cooperated. He invited them in, agreed to speak, and readily admitted making the posts. He explained that he had been angry with the President and was venting frustration online and had no intention to follow through. He voluntarily consented to a search of his home. Agents found a 9mm pistol magazine and a box of ammunition—both legally possessed.

Mr. Vance was charged in a three-count Indictment, based on two posts on Bluesky: Threats Against the President And Vice President (Count One), in violation of 18 U.S.C. § 871 and Transmission In Interstate Commerce Of A Threat To Injure Another Person (Count Two), in violation of 18 U.S.C. § 875(c). Both counts stemmed from the following message:

> If tRump, Vance, or Musk ever come to my city again, they will leave it in a body bag. I will either be shot by a secret service sniper or spend the rest of my life in prison. I've only got about 10 years of life left anyway, so I don't fucking care either way.

Count Three charges another violation of 18 U.S.C. § 875(c). It arose from a reply to another user's post referencing Donald J. Trump Jr.: "I will murder that stupid fucker before he gets secret service protection." Mr. Vance also posted an image of a firearm with a caption "Anti MAGA tool. And yes, that's my gun."

Mr. Vance pled guilty to all three counts without a plea agreement, accepted full responsibility, and began mental-health treatment at Arbor Circle immediately after his arrest. Although the statements were troubling, there is no evidence that Mr. Vance intended or planned to act on them. His full cooperation, consent to search, and voluntary treatment demonstrate remorse, insight, and an absence of danger.

### B. *History and Characteristics of the Defendant — § 3553(a)(1)*

Mr. Vance is a 67-year-old first-time offender with no criminal history, who has never engaged in violent conduct.

#### 1. *Personal History and Trauma*

Mr. Vance suffered severe childhood abuse and neglect. Both parents were alcoholics. They often fought with each other, both verbally and physically. Mr. Vance's father was an "evil, sadistic man" who physically and mentally abused him and sexually abused his sister. His mother was emotionally abusive and failed to protect her children.

As a child, Mr. Vance endured humiliation and shame. He was not properly toilet trained, and he wore diapers well into adolescence. At age eight, his parents sent him outside in diapers to ridicule him publicly. These experiences have caused deep and lasting psychological trauma. Mr. Vance still enjoys wearing diapers. As an adult, Mr. Vance

3

identifies as part of the Adult Baby/Diaper Loving community—an unusual but noncriminal and nonsexual coping mechanism rooted in early trauma and shame.

*2. Physical and Mental Health*

Mr. Vance suffers from serious chronic medical conditions: chronic obstructive pulmonary disease, diabetes, hypertension, high cholesterol, acid reflux, incontinence, hypothyroidism, and stage 3 chronic kidney disease. He had a heart attack in 2024 and suffers from essential tremors that cause uncontrollable shaking in his hands.

Mr. Vance has been diagnosed with post-traumatic stress disorder (PTSD) and believes he has undiagnosed bipolar disorder. He experiences severe manic and depressive episodes and has attempted suicide multiple times—by hanging, stabbing, starvation, and attempting to jump from a bridge. He is now in ongoing therapy at Arbor Circle and is committed to treatment.

*3. Acceptance of Responsibility and Low Risk of Recidivism*

Mr. Vance has expressed genuine remorse. (Attachment 1, Defendant's Letter). He understands the seriousness of his statements and their potential impact. His age, health challenges, lack of any prior criminal history, and active participation in treatment all indicate that he is among the least likely individuals to reoffend.

Although he has made threats and inappropriate remarks in the past, he has never acted on them, underscoring that his behavior stems from mental illness and distress, not from any intent to commit violence. He has taken meaningful steps to address these underlying issues. Mr. Vance remains fully engaged in therapy and has sought additional ways to manage his impulsivity and anger. For example, he recently began attending a

4

karate school to develop self-discipline and emotional control. (Attachment 2, Letter from Sean Thayer). His instructor describes his progress as "remarkable," noting Mr. Vance "commitment and transformation in his dedication to personal growth and character development."

Mr. Vance's pastor, who has known him for four years, attests that Mr. Vance's conduct reflects diminished capacity rather than malice. (Attachment 3, Letter from Rev. Ronnie P. Floyd). He describes Mr. Vance as a mild-mannered and gentle person when he is taking his prescribed medication. In the pastor's view, continued treatment and mental-health support—rather than incarceration—offer the best path to rehabilitation and, ultimately, the greatest protection for the community in the long run.

    C.    *The Need for the Sentence Imposed – § 3553(a)(2)*

The statutory purposes of sentencing—punishment, deterrence, protection of the public, and rehabilitation—are fully satisfied by a substantially reduced, non-custodial sentence. Treatment directly addresses the psychological and emotional factors underlying his conduct and thereby reduces the risk of future offenses far more effectively than imprisonment.

Punishment: The investigation, prosecution, and felony conviction have already imposed profound personal and reputational consequences.

Specific Deterrence: Mr. Vance has been humbled and deeply affected by this prosecution. He is receiving treatment and remains under supervision; further incarceration would add little deterrent value.

5

General Deterrence: The public already sees that such statements are taken seriously and prosecuted. The deterrent effect does not depend on a lengthy prison term.

Protection of the Public: Mr. Vance has no history of violence and poses no ongoing threat. Continued treatment and supervision protect the public more effectively than imprisonment.

Rehabilitation: Ongoing therapy is crucial to his stability. Incarceration would interrupt that progress and risk regression.

A sentence of probation with mental-health treatment and home confinement, would be "sufficient, but not greater than necessary" to achieve the purposes of § 3553(a).

## II. The Guideline Calculation Overstates the Seriousness of the Offense

The guideline computation substantially overstates Mr. Vance's culpability. The government charged him with two offenses encompassing four individuals. Counts One and Two allege threats against the President, Vice President, and Elon Musk, while Count Three concerns a separate post directed at Donald J. Trump, Jr. Because the threat against Trump, Jr. appeared in a distinct post, Count Three does not group with other counts under § 3D1.2. *See* § 2A6.1, cmt. n. 3 ("multiple counts involving different victims are not to be grouped under § 3D1.2"). Instead, the counts are combined under § 3D1.4, which adds two offense levels and increases the advisory range from 24–30 months to 30–37 months—a nearly 25 percent increase in punishment.

That increase is arbitrary and produces an unwarranted disparity. The guidelines in this context elevate form over substance—the very outcome the Sentencing Commission sought to avoid. As the Commission explained, the grouping rules were designed to "limit

6

the significance of the formal charging conduct," and enhancements for multiple counts are appropriate only when they "represent additional conduct that is not otherwise accounted for." U.S.S.G. Ch. 3, Pt. D, Introductory Commentary.

Here, the enhancement reflects nothing more than the indictment's structure rather than any meaningful difference in culpability. Had Mr. Vance threatened all four individuals in both posts, the counts would have been grouped and the two-level increase under § 3D1.4 would not apply. Yet his culpability, conduct, motive, and intent would be identical. All the posts stem from the same underlying frustration with the political climate and represent a single, continuous course of conduct rather than discrete criminal episodes. Moreover, his offense level already includes a separate two-level enhancement for making more than three threats. (PSR ¶ 34, PageID.52).

The result is a distorted guideline range that exaggerates the offense's seriousness by double-counting the same course of conduct. The mechanical application of § 3D1.4 here inflates punishment based solely on charging formalities—an outcome contrary to the purposes of § 3553(a), which direct courts to impose a sentence that is "sufficient, but not greater than necessary," to reflect the offense's true gravity.

A downward variance is warranted to correct this artificial increase and restore proportionality. The same conduct should yield the same punishment, regardless of whether it is divided across counts or combines it in one. Adjusting for this structural distortion would produce a sentence that more accurately reflects Mr. Vance's actual culpability and the true seriousness of the offense.

### III. Legal Objection: The Zero-Point Offender Reduction Applies

Mr. Vance objects to the PSR's refusal to apply the zero-point offender reduction under U.S.S.G. § 4C1.1. Section 4C1.1 grants a two-level reduction to defendants with no criminal history points who meet eleven listed criteria. There are two disputed issues, (1) whether Mr. Vance's online posts constitute "credible threats of violence" under § 4C1.1(a)(3), and (2) whether Mr. Vance possessed a firearm in connection with the offense, under § 4C1.1(a)7).

*A. Mr. Vance did not make credible threats of violence*

The guidelines do not define the "credible threat of violence." The court looks at ordinary meaning and consult dictionaries. The word "threat" commonly means "[a] communicated intent to inflict harm or loss on another." *United States v. Roberson*, No. 23-5588, 2024 WL 2154285, at *4 (6th Cir. May 14, 2024) (quoting *Black's Law Dictionary* 1618 (9th ed. 2009)).

It is not enough that defendant made a threat—the threat must be *credible. Roberson*, 2024 WL 2154285, at *4. A "credible threat" is a believable communication of intent to inflict harm, supported by circumstances indicating realistic possibility that violence will follow. *Roberson*, 2024 WL 2154285, at *4 (6th Cir. May 14, 2024); *United States v. Pineda-Duarte*, 933 F.3d 519, 522 (6th Cir. 2019). "The guideline thus excludes 'hyperbole,' sarcasm, or similar statements that, when read in context, could not be reasonably read as communicating a realistic 'possibility that violence will follow[.]'" *Roberson*, 2024 WL 2154285, at *5 (quoting *Counterman v. Colorado*, 600 U.S. 66, 74 (2023)). The Sixth Circuit explained that the provision applies when a person "credibly

8

communicates" an intent to injure another, such as threatening to hit someone with a shovel while actually holding the shovel. *Pineda-Duarte*, 933 F.3d at 522; *United States v. Miller*, 2024 WL 363731, at *4 (N.D. Ohio Jan. 26, 2024). This example illustrates that "there must be some temporal and spatial proximity between the defendant, his threat, and his intended victim." *Miller*, 2024 WL 363731, at *4.

Courts evaluate context to determine credibility of statements. *United States v. Mabery*, No. 23-5733, 2024 WL 4565573, at *5 (6th Cir. Oct. 24, 2024) (considering context when evaluating threat); *United States v. Johnson*, 64 F.4th 1348, 1352 (D.C. Cir. 2023) (in finding statement were credible, court emphasized that a defendant was armed, had been convicted of several violent crimes including shooting, and much was at stake); *United States v. Yang*, No. CR 23-100 (JDB), 2024 WL 519962, at *4 (D.D.C. Feb. 9, 2024) ("Courts properly look to 'contextual evidence' to determine whether a threat is credible").

Mr. Vance's statements do not demonstrate "intent" to inflict harm nor a realistic "possibility that violence will follow." *Roberson*, 2024 WL 2154285, at *4. He was not in the same location as any target and had no plan to act. There is no evidence of contemporaneous planning, travel, weapon preparation, or steps to locate or approach any target, or any other preparation suggesting his words could be carried out. While Mr. Vance's language can be extreme, he has never acted on it. The online posts were rhetoric and bluster rather than realistic threats.

In *Yang*, the court applied the § 4C1.1 reduction to two January 6 defendants who participated in the Capitol riot, finding that he neither used violence nor made credible threats of violence. *Yang*, 2024 WL 519962, at *1. One defendant, Yang, grabbed an

9

officer's wrist and baton during a scuffle in the Rotunda. The other, Boulton, posted inflammatory videos online afterward, declaring, "The tree of liberty from time to time needs to be watered with the blood of patriots and tyrants," and warning politicians that "shit's gonna get real." *Id.* at *2. Nevertheless, the court concluded that "Yang did not act with the degree of aggression necessary to fairly characterize his actions as 'violence,'" *id.* at 4*, and that Boulton's statements, made after he left Washington, D.C., were not credible threats of violence. *Id.* at *5. Both defendants therefore qualified for the two-level reduction. Similarly, Mr. Vance posted his statements online but was nowhere near the individuals he mentioned, and there is no evidence he intended or planned to act on his words.

The facts in this case stand in contrast to cases where courts found credible threats. For example, in *Johnson*, the defendant was armed, had a history of violent conduct, and had previously committed a shooting. *Johnson*, 64 F.4th at 1350. In *Bauer*, the defendant stood steps from a lawmaker's office during the January 6th Capitol attack, shouting about hanging that lawmaker while inciting a violent mob. *Bauer*, 714 F. Supp. 3d 1, *6-7.

By contrast, Mr. Vance is a 67-year-old, medically fragile, first-time offender who, although he made threats in the past did not act on them, and who cooperated fully, consented to searches, admitted guilt, and sought counseling immediately. His history shows impulsivity and psychological distress, not intent or capacity for harm. Disqualifying such an individual from § 4C1.1's protection would defeat the Sentencing Commission's purpose: to distinguish first-time, non-violent offenders from dangerous recidivists. The reduction should therefore apply.

### B. *Mr. Vance did not possess a firearm in connection with the offense*

Section 4C1.1(a)(7) disqualifies a defendant who possess, receive, transport, transfer, sell or otherwise dispose of a firearm in connection with the offense. U.S.S.G. § 4C1.1(a)(7). Mr. Vance did none of those things.

The government's theory rests on two facts: (1) a social-media image of a firearm captioned "Anti-MAGA tool. And yes, that's my gun," and (2) the later discovery of a firearm in Mr. Vance's residence during a search two months after the post. Those facts do not establish possession "in connection with the offense."

First, posting an image is not "possession" of a firearm in connection with the offense. The social media post at issue involves only a photograph and words, not conduct involving an actual weapon. The text of § 4C1.1(a)(7) focuses on *physical or transactional* firearm conduct ("possessed, received, transported, transferred…"). The firearm played no operative role beyond appearing in a photograph. It was not physically employed and played no operative role beyond an image.

Second, "possession" requires a direct nexus between the firearm and the offense conduct. The firearm must have been possessed in connection with the offense—that is, it must have played some operative or facilitative role in the commission of the crime. Mere ownership or incidental possession is not enough.

Mr. Vance's alleged threats occurred online. There was no physical firearm involved in the commission of the offense—no brandishing, display to the target, or contemporaneous possession during the offense. The firearm was not present, used, or

available when the threatening statements were made. It therefore was not "possessed … in connection with the offense."

Because Mr. Vance did not possess a firearm in connection with the offense, § 4C1.1(a)(7) does not apply. The social media post at issue involves only a photograph and words, not conduct involving an actual weapon. Accordingly, this factor does not disqualify him from the two-level reduction for zero-point offenders.

### IV. Conclusion

Mr. Vance's conduct was serious, but it reflected mental illness and frustration—not violence or genuine intent to harm. His age, fragile health, and severe trauma make imprisonment disproportionately harsh and unnecessary. Sentence emphasizing treatment, supervision, and mental-health care will satisfy all § 3553(a) objectives—punishment, deterrence, protection, and rehabilitation—without imposing a sentence greater than necessary.

For these reasons James Donald Vance, Jr., respectfully requests that the Court impose a non-guideline sentence below the advisory range, consistent with the principles of 18 U.S.C. § 3553(a) and the purposes of the sentencing guidelines.

Respectfully submitted,

SEAN R. TILTON
Federal Public Defender

Dated: November 3, 2025

/s/ Helen C. Nieuwenhuis
HELEN C. NIEUWENHUIS
First Assistant Federal Public Defender
50 Louis, NW, Ste. 300
Grand Rapids Michigan 49503
(616) 742-7420

JASNA TOSIC
Research & Writing Specialist